UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

SOCIALRYSE LLC, d/b/a BHBIGFLUCE RECORDS,:    Civil Action No.

                Plaintiff,            :   **AMENDED COMPLAINT** :

   -against-                   :

                              :   [Jury Trial Demanded]

YOUTUBE LLC and GOOGLE LLC,        :

            Defendants.      :

---------------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.    This action arises from Defendants' wrongful conduct toward Plaintiff SocialRyse LLC concerning Plaintiff's 2023 participation in Defendants' Content ID monetization system through authorized distributor Venice Music. In May 2023, Plaintiff uploaded several original sound recordings through Venice Music's Content ID portal. Those recordings were accepted into Defendants' Content ID system and began generating automated monetization revenue. In July and August 2023, Venice Music informed Plaintiff that Defendants had applied backend enforcement designations—"Invalid reference" and "Potential violation of YouTube monetization policy"—to Plaintiff's reference files and stated that distributors face penalties if they monetize content that Defendants designate as ineligible. Plaintiff owns 100% of the copyrights in the designated sound recordings. No entity has disputed that ownership. Defendants have not communicated to Plaintiff or to Venice Music any published rule that Plaintiff's content violated. After review of written documentation provided by Plaintiff, Defendants reactivated monetization on Plaintiff's releases on November 14, 2023. Account-level suppression continued thereafter. In the months following that reactivation, Plaintiff's Venice Music account—which had generated $9,225.14 in August 2023—has generated less than $1.00 per month in every month from June 2024 through December 2025 (19 consecutive months), with total revenue of less than $2.00 across

calendar year 2025. Plaintiff asserts state-law claims for tortious interference with prospective economic advantage, fraud, negligent misrepresentation, trade libel, promissory estoppel, and unfair competition, and seeks injunctive and declaratory relief. More than two years after Defendants' own review-and-reactivation determination, Defendants' backend designations and account-level suppression mechanisms remain in place, and Plaintiff has no direct appeal, no published review standard, and no mechanism through which to obtain review of the continuing restrictions.

## PARTIES

2.      Plaintiff SocialRyse LLC, doing business as BHBIGFLUCE Records ("SocialRyse" or "Plaintiff"), is a New York limited liability company with its principal place of business in Brooklyn, New York. Its sole member is Ralph Cohen, a citizen of New York. During the events described in this Complaint, Plaintiff operated under the trade name BHBIGFLUCE Records in its relationship with Venice Music.

3.      Defendant YouTube LLC ("YouTube") is a Delaware limited liability company with its principal place of business in San Bruno, California, and is a wholly owned subsidiary of Google LLC. Upon information and belief, all its members are citizens of states other than New York.

4.      Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California. Upon information and belief, all its members are citizens of states other than New York.

5.      Google owns and controls YouTube. Google and YouTube are referred to collectively herein as "Defendants."

## JURISDICTION AND VENUE

6.      This Court has diversity jurisdiction under 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff (New York) and Defendants (California/Delaware), and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred here, Plaintiff resides and suffered injury here, and Defendants transact substantial business here.

8.      This Court has personal jurisdiction over Defendants under N.Y. C.P.L.R. § 302(a)(1)-(3) and the Due Process Clause of the Fourteenth Amendment. Defendants transact substantial business in New York, derive substantial revenue from New York, and have purposefully availed themselves of the privilege of conducting activities in New York. Plaintiff is a New York limited liability company with its principal place of business in New York, and Plaintiff's injuries from Defendants' conduct have been suffered in New York. Defendants' enforcement designations, as alleged herein, were directed at a New York rights holder and affected Plaintiff's New York-based business operations, including Plaintiff's revenue, distributor relationships, and catalog administration. The exercise of personal jurisdiction over Defendants in this District is consistent with traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

*A.      Plaintiff's Business and Original Music Catalog*

9.      Plaintiff SocialRyse LLC, founded in 2018, is a rights holder that creates and owns the copyrights in an original music catalog. During the events described in this Complaint, Plaintiff operated its Venice Music relationship under the trade name BHBIGFLUCE Records. The catalog consists primarily of instrumental music created for use in audiovisual media. Individual works within the catalog were released under various artist stage names, including but not limited to

"Zephyr" and "Bryan Stark," while Plaintiff retained ownership and control of the copyrights in all such works.

10. Plaintiff's copyrighted sound recordings are enrolled in Defendants' Content ID system through Plaintiff's authorized distributor, Venice Music. When a user-uploaded video on YouTube contains a matching recording, Defendants' Content ID system automatically detects the match and allocates monetization revenue to Plaintiff as the identified rights holder, regardless of the identity of the uploader or the origin of the video. User-uploaded videos incorporate Plaintiff's copyrighted recordings through multiple pathways, including (i) videos posted on YouTube channels associated with Plaintiff's independent promotional service contractor, and (ii) videos independently posted by YouTube channels and creators with no promotional or contractual relationship with Plaintiff. Plaintiff does not own or control any of these channels, does not control the non-music content of any video incorporating its music, and does not control the upload decisions of any uploader. Any revenue received by Plaintiff through Content ID is generated by Defendants' automated detection of Plaintiff's copyrighted recordings in user-uploaded videos, not by any monetization of user-uploaded videos by Plaintiff.

*B. Defendants' Content ID System*

11. Defendants' Content ID system performs two functions: copyright detection and monetization/revenue allocation. Through Content ID, advertising and subscription revenue from user-uploaded videos is allocated to rights holders based on detected usage of their copyrighted sound recordings.

12. According to Defendants' publicly reported data, YouTube processed over 2.2 billion Content ID claims in 2024. Rights holders chose to monetize more than 90% of Content ID claims

rather than block the underlying content. Content ID has paid out over $12 billion cumulatively to rights holders, including approximately $3 billion in 2024 alone.

13. Content ID's "monetize" policy operates as an automated revenue-allocation mechanism. When a rights holder sets its Content ID policy to "monetize," the rights holder receives proportional revenue allocation from the Content ID system when its copyrighted content is detected in creator-uploaded videos. Authorized distributors such as Venice Music, DistroKid, TuneCore, and CD Baby default to "monetize" policy for Content ID claims.

14. Defendants have publicly stated that Content ID functions to ensure that rights holders "can be allocated revenue proportional to the share they are owed."

*C. Structural Asymmetry Between Major-Label and Independent Rights Holders*

15. Major-label rights holders access Defendants' Content ID system through their own Content Management System (CMS) accounts pursuant to direct contractual arrangements with Defendants. Independent rights holders such as Plaintiff access Content ID exclusively through authorized third-party distributors and do not have direct contractual relationships with Defendants governing Content ID participation.

16. Major-label rights holders with direct CMS access possess tools unavailable to independent rights holders, including manual claiming and claim review tools, direct reference file management, the ability to contest enforcement designations through Defendants' internal processes, and direct communication channels with Defendants' Copyright Management personnel and related enforcement and platform-relations functions. Independent rights holders have no such direct access.

17.    Independent rights holders, including Plaintiff, depend upon authorized distributor intermediaries who are themselves subject to Defendants' enforcement designations and Defendants' penalty structure. This structural asymmetry means that Defendants' enforcement designations against independent rights holders operate through a mechanism from which those rights holders have no meaningful direct recourse, while major-label rights holders engaged in materially identical monetization activity access Defendants' system on direct contractual terms with direct appeal capability.

*D. Plaintiff's Enrollment With Venice Music and Initial Monetization (May–July 2023)*

18.    In or about May 2023, Plaintiff submitted reference files for several original sound recordings through Venice Music's (Venice Innovation Labs Inc.) portal for Content ID monetization, under Plaintiff's trade name BHBIGFLUCE Records. The uploaded recordings included works released under the artist stage name "Zephyr," including the album Louder Actions and individual tracks titled Clouds, Believe, and Balloon, and works released under the artist stage name "Bryan Stark," including the track Quarantine. Plaintiff owns 100% of the copyrights in all uploaded sound recordings and underlying musical compositions. No entity has disputed Plaintiff's ownership.

19.    Upon upload, Plaintiff's recordings were accepted into Venice Music's Content ID system and began generating automated monetization revenue through Defendants' platform. During the initial accounting periods of Plaintiff's Venice Music relationship, Plaintiff's account generated $9,225.14 in the August 2023 accounting period. Individual Zephyr tracks generated monthly revenue ranging from hundreds to thousands of dollars.

E. Defendants' Enforcement Designations and Venice Music Deactivation (July–August 2023)

20.     On or about July 6, 2023, Venice Music sent Plaintiff a written communication titled "Unauthorized Activity Detected: Louder Actions," stating that "music platforms" had flagged Plaintiff's releases for "Potential copyright infringement on delivered sound recordings" and "Ineligible content for monetization on YouTube Content ID." Venice Music requested that Plaintiff issue an immediate takedown of the flagged content from YouTube Music and YouTube Content ID and stated that failure to comply may subject the account to "account termination and full catalog removal." (Ex. A.)

21.     Plaintiff responded on July 6, 2023, asserting 100% ownership of the music and requesting specific information regarding the claimed issues. Venice Music did not respond. Plaintiff sent a follow-up communication on July 10, 2023. Venice Music again did not respond. On July 13, 2023, Plaintiff sent a third communication providing Venice Music with links to original music videos produced by Plaintiff.

22.     Venice Music thereafter responded, acknowledging Plaintiff's ownership but stating that the issue flagged by YouTube concerned the Zephyr Louder Actions album and its "eligibility" to monetize on YouTube Content ID. Venice Music quoted Defendants' language: "Our systems detected that it is likely that this reference is being used to circumvent our monetization eligibility requirements by using Content ID to monetize content that is ineligible for monetization." Venice Music provided Plaintiff with a screenshot showing Defendants' backend "Invalid reference" designation applied to Plaintiff's Clouds and Balloon reference files, with "Potential violation of YouTube monetization policy" displayed as the stated sub-category under that designation. (Ex. A.)

23.     On or about August 16, 2023, Venice Music informed Plaintiff that Defendants had "deactivated Content ID on Zephyr releases due to repeated invalid Content ID claims due to

suspicious reference segments in the sound recordings that do not meet Content ID eligibility requirements and circumventing Content ID monetization policy." (Ex. B.) Plaintiff responded, stating that all Zephyr music was original, that Plaintiff did not own or control any of the channels that used its music in their videos, and requesting reactivation of the Zephyr reference files.

24.     Plaintiff's counsel thereafter sent a written demand to Venice Music's legal department for reactivation of Content ID references for the tracks "Clouds," "Believe," and "Balloon," stating that the deactivation was carried out without just cause or prior notification. The demand also authorized Venice Music to release any claims it deemed "suspicious" and expressed Plaintiff's commitment to cooperate with any investigation or review process.

25.     Venice Music's legal department responded through Dani Oliva, Vice President of Business and Legal Affairs, stating that YouTube Content ID had identified claims that 'negatively impact Venice's Tier A status with YouTube.' Venice Music stated that the claims resulted from delivered audio reference files that 'do not comply with Google's current Copyright Management eligibility criteria,' that 'YouTube will also flag suspicious claims that appear to be associated with attempts to circumvent YouTube monetization policy,' and that 'YouTube penalizes distributors for monetizing ineligible content or claimed videos which appear to circumvent their Content ID monetization policies.' (Ex. B.)

26.     Venice Music's distribution model provides artists with 100% of net revenue from monetized content and retains no revenue share for itself. Venice Music's compliance with Defendants' enforcement designations was driven by the risk of penalties to Venice Music's Content ID access, Tier A platform standing, and ability to service its other clients.

*F. Defendants' Review, Reactivation, and Continued Suppression (October–November 2023 and Continuing)*

27.     After the flagging of the Zephyr Louder Actions album and Venice Music's August 16, 2023 deactivation of Plaintiff's Content ID references, revenue across Plaintiff's Venice Music account collapsed. The account earned $9,225.14 in August 2023 and $5,685.96 in September 2023 before dropping to $121.82 earned in October 2023—a near-total collapse in monetization activity in the first full month after deactivation. (Ex. D.) Additional tracks within Plaintiff's catalog, including works released under other stage names, were suppressed, with claims failing to generate revenue regardless of which sound recording was uploaded.

28.     On or about October 13, 2023, Venice Music informed Plaintiff that it was "still awaiting details from YouTube regarding the flagged releases." On or about October 18, 2023, Venice Music stated that "YouTube has requested further information" regarding two specific releases— "Beautiful Fireworks" and "Forsaken Mic"—and "the abnormal activity detected regarding Content ID claims and what [it] declares to violate YouTube Spam, Deceptive Practices and Scam policies." (Ex. C.) Venice Music asked Plaintiff to explain why specific segments of two identified videos were "valid." Both videos were approximately two years old, predating Plaintiff's enrollment with Venice Music. Plaintiff did not own or control the YouTube channels on which those videos appeared. Plaintiff responded to this specific request by offering to release any claims associated with the two flagged videos.

29.     Plaintiff thereafter provided a fuller response. Plaintiff stated that BHBIGFLUCE Records had entered into a written music promotion agreement with TTMedia, an independent promotional service contractor, for the promotion of Plaintiff's music on YouTube channels controlled or managed by TTMedia, and that Plaintiff did not own or control any such channels and had no control, influence, or involvement in the creation, selection, or presentation of content posted by TTMedia. Plaintiff provided Venice Music with a copy of the written music promotion agreement

for transmission to Defendants for their review. On or about October 27, 2023, Venice Music informed Plaintiff that it had shared details regarding the music promotion agreement with the YouTube team and was awaiting their review and feedback. (Ex. C.) The agreement vested TTMedia with exclusive and absolute control over the content and channels used to promote the Music, and provided that Plaintiff had no control or involvement in the creation, selection, or presentation of content posted by TTMedia.

30.     On or about November 14, 2023, Venice Music informed Plaintiff that "YouTube has reactivated monetization on the mentioned releases." (Ex. C.) Defendants had received, through Venice Music, Plaintiff's disclosures regarding 100% copyright ownership, the written TTMedia promotional agreement, and the contractual separation between Plaintiff and the channels incorporating Plaintiff's music. Defendants' determination was that the flagged content was eligible for monetization.

31.     Following Defendants' November 14, 2023 reactivation, Plaintiff's Venice Music account earned $1,103.54 in November 2023—only approximately 12% of the $9,225.14 earned during the August 2023 accounting-period baseline—reflecting only a partial and short-lived recovery rather than a restoration to normal monetization levels. Beginning December 2023, revenue collapsed to negligible amounts. In every month from June 2024 through December 2025—a period of 19 consecutive months—Plaintiff's account generated less than $1.00, with monthly revenue ranging from $0.00 to $0.79. The only significant payments following the November 2023 reactivation were a February 2024 payment of $1,245.03—nearly all of which was attributable to the track "Forsaken Mic," one of the two specific releases Defendants had reactivated on November 14, 2023—a March 2024 payment of $216.28, and an April 2024 amount of $15.14. Upon information and belief, those payments reflect late-posting or true-up payments for claim

activity occurring in prior periods rather than ongoing monetization. In calendar year 2025, Plaintiff's total Venice Music revenue was less than $2.00. (Ex. D.)

32.     Plaintiff observed following Defendants' November 14, 2023 reactivation that Content ID claim activity on Plaintiff's catalog was not being restored to pre-flagging levels. Plaintiff raised this observation with Venice Music during the days following the reactivation. Notwithstanding Venice Music's confirmation of delivery and general statements that Content ID was active, claim activity on Plaintiff's catalog did not resume at pre-flagging levels. Specific sound recordings within Plaintiff's catalog that had generated substantial Content ID claim activity in user-uploaded videos during Plaintiff's initial Venice Music Content ID participation in 2023—including the Louder Actions album by Zephyr (including the tracks "Balloon," "Believe," and "Clouds"), the track "Forsaken Mic," and the track "Quarantine" released under the Bryan Stark stage name—ceased generating claims at comparable rates following the November 14, 2023 reactivation. On or about October 2, 2023—during the period between Defendants' initial enforcement action and the November 14, 2023 reactivation—Plaintiff delivered four additional sound recordings to Venice Music for Content ID participation. Each of these additional recordings was original content owned by Plaintiff and released under a different artist stage name within Plaintiff's catalog—distinct from the "Zephyr" and "Bryan Stark" stage names under which Plaintiff's previously flagged content had been released—notwithstanding Plaintiff's continued ownership of all such works. Those additional reference files did not generate Content ID claim activity either during the enforcement-period suppression or following the November 14, 2023 reactivation, consistent with account-level suppression affecting Plaintiff's Venice Music catalog as a whole rather than content-specific enforcement directed at any particular stage name or flagged release. Upon information and belief, the reduction in claim-generation activity reflects backend

configuration, threshold, match-confidence, or other technical adjustments to the matching and claim-generation functions applicable to Plaintiff's reference files, operating independently of the specific visible designations Defendants reviewed and cleared. This pattern is consistent with account-level suppression operating through mechanisms that continued to affect Plaintiff's monetization beyond the specific designations Defendants had reviewed and cleared.

33.    Plaintiff's catalog, which was generating $9,225.14 monthly at the time of the initial flagging, has been effectively suppressed at near-zero revenue levels for more than 19 consecutive months following Defendants' own determination that the flagged content was eligible for monetization. (Ex. D.) This revenue collapse occurred without any change in Plaintiff's catalog, Plaintiff's distributor, or the accessibility of third-party videos incorporating Plaintiff's music on Defendants' platform. Tracks that had generated substantial Content ID revenue before the enforcement action produced little or no measurable monetization activity following the reactivation. Account-level suppression continued after Defendants' November 14, 2023 determination through mechanisms that operate independently of the specific flags that Defendants reviewed and cleared.

*G. Defendants' Backend Enforcement Designations*

34.    Defendants' backend enforcement designation "Invalid reference"—under which "Potential violation of YouTube monetization policy" was displayed as the stated sub-category in Defendants' distributor-facing interface—is a designation applied to specific reference files within Defendants' Content ID infrastructure. Defendants' published support page titled "Review potentially invalid references" (available at https://support.google.com/youtube/answer/6013183) describes "Invalid reference" as a system-level designation that triggers a structured review workflow with defined statuses ("Action required," "Waiting," "Resolved"), automated deadlines, and specified consequences. The "Potential violation of YouTube monetization policy" sub-

category applied to Plaintiff's reference files in 2023 was, upon information and belief, added to Defendants' published enumeration of "Invalid reference" sub-categories in or about 2023.

35. The designations were applied to reference files for sound recordings Plaintiff owns in their entirety. Plaintiff owns 100% of the copyrights in the flagged recordings. No entity has disputed that ownership. Defendants have not communicated to Plaintiff or to Venice Music any specific published Content ID rule or policy provision applicable to rights holders that Plaintiff's content violated. References by Defendants to "hidden recordings" as a "discouraged YouTube monetization practice" do not correspond to any published rule or policy provision governing rights-holder conduct under Defendants' Content ID system.

36. Defendants transmitted the "Invalid reference" designation, with "Potential violation of YouTube monetization policy" as its stated sub-category, to Venice Music through Defendants' backend enforcement system. Venice Music communicated Defendants' designations to Plaintiff, and acted on those designations by terminating Plaintiff's monetization. (Exs. A–C.)

37. Upon information and belief, in addition to the designations described above, Defendants' Content ID enforcement system designates claims as "pending," "under review," or otherwise subject to manual verification when recordings are detected within user-uploaded video content. Monetization on such claims is delayed, restricted, or withheld pending distributor-level or internal review. Upon information and belief, account-level suppression mechanisms applied to Plaintiff's catalog operate through such designations and continue to affect Plaintiff's monetization after Defendants' November 14, 2023 reactivation of specific flagged releases.

*H. Distributor Penalty Structure*

38. Venice Music's legal department stated in writing that the flagged claims "negatively impact Venice's Tier A status with YouTube" and that "YouTube penalizes distributors for

monetizing ineligible content." (Ex. B.) Authorized distributors such as Venice Music access Content ID through Defendants' infrastructure and are subject to Defendants' enforcement designations. Venice Music's stated rationale accepted Defendants' determination as the operative basis for deactivation and invoked Venice Music's distributor-agreement discretion as the contractual mechanism for effectuating that deactivation.

39.     Defendants' published "Content Manager responsibilities and feature access" page (available at https://support.google.com/youtube/answer/9142671) describes consequences for distributors who do not comply with Defendants' enforcement determinations, including loss of access to CMS features, loss of the ability to link channels or upload videos, and "termination of [the distributor's] entire content owner family." These consequences are not limited to the specific flagged content. Defendants' published "Content ID reference delivery policy" within the same page further provides that content managers "must keep invalid Content ID references <1% of their content owner catalogue and not exceed 500 invalid references within a 30 day period," and that "[c]ontent owners that exceed this may have reference delivery throttled or disabled." Under this policy, backend enforcement designations Defendants apply to any individual rights holder's references accumulate against the distributor's entire catalog threshold and can result in platform-wide throttling or disabling of the distributor's reference delivery capability.

*I. Absence of Contractual or Published-Rule Basis for Plaintiff's Exclusion*

40.     Defendants do not have a direct Content ID participation contract with Plaintiff, and Plaintiff did not enter into any direct contractual agreement with Defendants containing a forum selection, arbitration, or dispute resolution provision applicable to Content ID participation. Content ID participation is governed by distributor agreements. Notwithstanding the absence of a direct contract, Defendants voluntarily engaged with Plaintiff's content through Defendants' own

infrastructure: Defendants' automated systems accepted Plaintiff's reference files into Content ID, generated monetization revenue on Plaintiff's recordings from independently uploaded videos, transmitted backend designations to Plaintiff's authorized distributor concerning specific reference files owned by Plaintiff, reviewed information submitted on Plaintiff's behalf, and, on November 14, 2023, reactivated monetization on identified releases. Defendants' conduct constitutes a course of dealing in which Defendants supplied factual designations to Plaintiff's authorized distributor for the guidance of that distributor in making eligibility and enforcement decisions affecting Plaintiff's identified catalog, giving rise to a duty of ordinary care and honesty in the factual designations Defendants transmitted to Plaintiff's authorized distributor concerning Plaintiff's content.

41.    Defendants' published circumvention policy addresses conduct by YouTube channel operators who upload content to circumvent the platform's monetization rules. Plaintiff is not a channel. Plaintiff is a rights holder whose original copyrighted music was detected in third-party videos through automated fingerprint matching. Defendants' published "Content Manager responsibilities and feature access" page defines the "circumventing systems" policy as obligations imposed on content managers (authorized distributors who operate CMS accounts). Plaintiff is not a content manager, does not operate a CMS account, and does not have access to the CMS tools governed by this policy.

42.    Defendants' published "Content eligible for Content ID" page (available at https://support.google.com/youtube/answer/2605065) enumerates categories of content ineligible for use as a Content ID reference: content licensed non-exclusively from a third party; content released under Creative Commons or similar open licenses; public domain footage, recordings, or compositions; clips used under fair use principles; video gameplay footage; karaoke recordings,

remasters, and sound-alike recordings; sound effects, soundbeds, or production loops; compilations, DJ mixes, mashups, countdown lists, and full album sound recordings. Plaintiff's content is not within any of those categories.

43.    Defendants' "Potential violation of YouTube monetization policy" designation is applied to reference files at the asset level and, on its face, represents that the designated reference file—a sound recording delivered by the rights holder—is the source of the alleged violation. In Plaintiff's case, the designation was applied to reference files for sound recordings that Plaintiff owns in their entirety and that contain no material outside Plaintiff's sole ownership. To the extent Defendants' designation rests on an allegation that Plaintiff's content "circumvents" monetization eligibility, the factual predicate for that allegation is the upload conduct of independent third-party channels that Plaintiff does not own or control, not any characteristic of the reference files themselves. Defendants' November 14, 2023 reactivation of the specific flagged releases—following Defendants' review of Plaintiff's ownership disclosures, the written TTMedia promotional agreement, and Plaintiff's disclosures regarding non-control of the YouTube channels—confirms that the designated reference files were not in fact ineligible. Defendants' continued maintenance of account-level suppression mechanisms after that determination is not consistent with the purported basis for the initial designation.

44.    Plaintiff did not create, compile, upload, or control any YouTube channels or the videos incorporating Plaintiff's music. Independent third-party channel operators created and uploaded those videos. Defendants maintain channel-level enforcement tools specifically directed at such upload conduct, including content removal, channel demonetization, channel strikes, and channel termination. Rather than address the alleged upload conduct through the channel-level tools directed at the responsible channel operators, Defendants applied asset-level enforcement

designations to Plaintiff's reference files and transmitted those designations to Plaintiff's authorized distributor, attributing to Plaintiff conduct of third parties Plaintiff does not own or control.

*J. Selective Application of Enforcement Designations*

45.    Defendants' Content ID rules and enforcement policies are stated on their face as applicable to all participating rights holders. Defendants' enforcement designations have been applied to Plaintiff's reference files at the asset level. Upon information and belief, Defendants apply enforcement designations like those applied to Plaintiff's catalog to independent rights holders while not applying comparable designations to major-label rights holders whose copyrighted sound recordings are detected in creator-uploaded videos through the same automated Content ID matching. Plaintiff's recordings and major-label recordings both participate in the same automated Content ID detection process and the same revenue-allocation system when detected in user-uploaded videos. Plaintiff's belief that Defendants apply enforcement designations asymmetrically is based on: the continued, publicly observable participation of major-label catalogs in Content ID monetization within user-uploaded videos on Defendants' platform; the absence of any publicly reported catalog-wide deactivation or comparable exclusionary enforcement action against any major-label rights holder in the Content ID system; and the structural asymmetry alleged in ¶¶ 15-17, whereby major-label rights holders access Content ID through direct CMS accounts with manual review and direct appeal capability unavailable to independent rights holders such as Plaintiff.

*K. Ongoing Injury*

46.     Upon information and belief, Defendants continue to maintain backend enforcement flags, restrictions, and internal designations affecting Plaintiff's catalog. Those designations continue to cause Plaintiff's references to be treated differently from references of comparable rights holders with undisputed copyright ownership.

47.     Plaintiff's monetization revenue has been reduced to near-zero levels and continues to accrue financial injury on a daily basis.

48.     Plaintiff has no mechanism to appeal, contest, or obtain review of Defendants' backend enforcement designations applicable to Plaintiff's content. Authorized distributors operate under Defendants' penalty structure and cannot provide meaningful recourse.

49.     Plaintiff has no adequate remedy at law for the ongoing restrictions on Plaintiff's Content ID participation. Content ID is the dominant automated system through which rights holders receive allocated revenue when their copyrighted sound recordings are detected in user-uploaded videos on Defendants' platform, and there is no substitute system through which Plaintiff can recover revenue associated with detection of Plaintiff's recordings in creator-uploaded content on Defendants' platform. Defendants' continued suppression deprives Plaintiff, on a daily and ongoing basis, of claim activity, accrued claim history, and participation in the automated allocation of revenue from creator-uploaded videos. The cumulative harm from Plaintiff's ongoing exclusion—including foregone claim activity, loss of accrued claim history, and impaired ability to build and maintain catalog value on Defendants' platform—is not susceptible to precise quantification, and each day of continued suppression produces additional harm of the same kind. Defendants have not provided, and Plaintiff does not have, any mechanism through which to appeal the designations or obtain review of the continued account-level restrictions. The injury caused by Defendants' continued suppression cannot be fully remedied by money damages alone.

50.     Plaintiff's claims are based on factual assertions made by Defendants through Defendants' backend enforcement infrastructure and on Defendants' own continuing conduct in maintaining account-level suppression affecting Plaintiff's catalog. Plaintiff does not seek to hold Defendants liable as the publisher or speaker of any information provided by another information content provider. Plaintiff does not challenge Defendants' editorial decisions concerning any third-party content, any third-party channel, or any user-uploaded video. Plaintiff's claims concern Defendants' own factual representations about Plaintiff's specifically identified reference files, Defendants' own transmission of those representations to Plaintiff's authorized distributor, and Defendants' own continuing conduct in maintaining enforcement mechanisms affecting Plaintiff's catalog after Defendants' own review determined the specific flagged content was eligible for monetization.

*L. Exhibits*

51.     The following exhibits are attached to this Complaint and incorporated by reference: Exhibit A (Venice Music communications to Plaintiff dated July 6, 2023 through July 17, 2023, including the "Unauthorized Activity Detected" notice, Defendants' verbatim circumvention language as relayed by Venice Music, and the screenshot showing Defendants' "Invalid reference" and "Potential violation of YouTube monetization policy" designations applied to Plaintiff's Clouds and Balloon reference files); Exhibit B (Venice Music communications to Plaintiff dated August 16–17, 2023, and correspondence from Venice Music Vice President of Business and Legal Affairs Dani Oliva dated August 16, 2023, concerning the Content ID deactivation and Venice Music's Tier A platform status with YouTube); and Exhibit C (Venice Music communications to Plaintiff dated October 4, 2023 through November 15, 2023, including the YouTube Studio screenshot showing "Invalid reference" designations for Beautiful Fireworks and

Forsaken Mic, the October 18, 2023 request for information regarding two identified videos, Plaintiff's October 24, 2023 response transmitting the music promotion agreement, and the November 14, 2023 reactivation notice); and Exhibit D (Venice Music payment statement for Plaintiff's BHBIGFLUCE Records label account, showing monthly Content ID earnings and payments from August 2023 through December 2025).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Tortious Interference with Prospective Economic Advantage (New York Law)**

52.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

53.    Plaintiff had an expectancy of continued economic benefit from the monetization of its original sound recordings through Venice Music's Content ID portal. Plaintiff uploaded original copyrighted recordings through that portal, the recordings were accepted into the Content ID system, and automated monetization revenue began to accrue.

54.    Defendants knew of Plaintiff's participation in Content ID monetization through Venice Music. Defendants' backend systems applied designations to Plaintiff's specific reference files, and Defendants transmitted those designations to Venice Music through Defendants' distributor-facing interface.

55.    Defendants interfered with Plaintiff's prospective economic relationship with Venice Music by transmitting to Venice Music the "Invalid reference" designation (with "Potential violation of YouTube monetization policy" as its stated sub-category) regarding Plaintiff's content. That designation was false: Plaintiff owns 100% of the copyrights in the designated reference files, no party has disputed that ownership, and Defendants have not communicated to Plaintiff or to Venice Music any published policy that Plaintiff's content violated. Venice Music

terminated Plaintiff's monetization in reliance on Defendants' designations. Plaintiff's claim is based on Defendants' communications to Venice Music regarding Plaintiff's content; it does not require a direct contractual or communicative relationship between Plaintiff and Defendants.

56. Defendants' interference was wrongful. Defendants made false factual assertions about Plaintiff's content. The designations attributed to Plaintiff, at the asset level, alleged defects arising from the upload conduct of independent third-party channels Plaintiff does not own or control. Defendants continued to maintain account-level suppression after their own review concluded on November 14, 2023 that the specific flagged content was eligible for monetization. Defendants acted in the face of Plaintiff's undisputed copyright ownership and with no published rule supporting the designations. Defendants chose to engage with Plaintiff's content through Defendants' own Content ID infrastructure—accepting Plaintiff's reference files, generating monetization revenue from detection of Plaintiff's recordings in user-uploaded videos, and transmitting designations to Plaintiff's distributor concerning Plaintiff's specific reference files— and, in the course of that engagement, transmitted the false designations that caused Venice Music to terminate Plaintiff's monetization.

57. Defendants' interference continues. Upon information and belief, Defendants continue to maintain backend designations and account-level suppression mechanisms affecting Plaintiff's catalog.

58. Plaintiff has suffered injury, including lost monetization revenue, destruction of distributor relationships, loss of goodwill, and ongoing daily loss of revenue. Plaintiff's account revenue has fallen from $9,225.14 in August 2023 to less than $2.00 in total across calendar year 2025. Aggregate damages will be proven at trial and exceed the jurisdictional minimum of $75,000. Plaintiff's injury is ongoing and is not fully remediable through money damages.

## SECOND CAUSE OF ACTION
### Fraud (New York Law)

59.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

60.   This claim is pleaded with particularity pursuant to Federal Rule of Civil Procedure 9(b).

61.   **Who.** The false factual assertions at issue were generated by Defendants' Content ID enforcement infrastructure, which Defendants designed, operate, and maintain. Corporations act through their systems and personnel. The designations at issue are institutional actions of Defendants, transmitted by Defendants' enforcement personnel in the ordinary course of Defendants' Content ID enforcement operations. As reflected in communications from Venice Music's legal department (Ex. B), the enforcement determinations at issue were attributed to Defendants' "Copyright Management" function applying eligibility criteria within Defendants' Content ID system. The personnel responsible for generating and transmitting enforcement designations include individuals within Defendants' Copyright Management function and related enforcement operations who apply, maintain, and transmit enforcement designations to authorized distributors through Defendants' distributor-facing interface. Identification of the specific individuals who applied the designations to Plaintiff's Venice Music reference files requires information within Defendants' exclusive control and will be obtained through discovery.

62.   **What.** Defendants communicated two false factual assertions about Plaintiff's content to Venice Music through Defendants' backend enforcement system:

(a)   The designation "Invalid reference." This designation asserts that Plaintiff's reference file does not meet Defendants' Content ID eligibility criteria. The assertion is false. The designation was applied at the asset level to specific reference files owned entirely by Plaintiff. Plaintiff owns 100% of the copyrights in the sound recordings and

musical compositions delivered as reference files. The references are original copyrighted works and are not within Defendants' published list of content categories ineligible for Content ID use. On November 14, 2023, Defendants reactivated monetization on the specific releases that had been designated, confirming that the specific flagged content was in fact eligible for monetization. The designation, on its face, represents that the reference file itself is the source of the asserted eligibility problem; it does not, on its face, communicate that the predicate for the designation is conduct by independent third-party channel operators Plaintiff does not own or control.

(b)     The sub-category "Potential violation of YouTube monetization policy" displayed under the "Invalid reference" designation in Defendants' distributor-facing interface, and the accompanying statement that "Our systems detected that it is likely that this reference is being used to circumvent our monetization eligibility requirements by using Content ID to monetize content that is ineligible for monetization." This sub-category and accompanying statement assert that Plaintiff's reference file is being used to violate Defendants' Content ID monetization policies. The assertion is false. Plaintiff owns 100% of the copyrights in the designated reference files, which are original sound recordings owned in their entirety by Plaintiff and not within any enumerated category of content Defendants have published as ineligible for Content ID use. Plaintiff received revenue through Defendants' own Content ID automated revenue-allocation system, which identified Plaintiff's recordings within third-party videos and allocated revenue to Plaintiff according to Defendants' own detection and allocation protocols. To the extent any third-party video contained content Defendants deemed ineligible for reasons independent of Plaintiff's reference file, that conduct is attributable to the channel operator who uploaded

the video, not to Plaintiff. Defendants have not communicated to Plaintiff or to Venice Music any published Content ID rule applicable to rights holders that Plaintiff's content violated. Plaintiff is not a content manager and does not operate a CMS account governed by Defendants' "circumventing systems" policy. Defendants' published policies concerning "circumvention" address channel-level upload conduct and content-manager CMS conduct. Plaintiff's copyrighted sound recordings were detected in independently uploaded third-party videos through Defendants' automated fingerprint-matching system.

63.    **When.** Defendants transmitted the designations to Venice Music through their backend enforcement system on or before July 6, 2023 (the date of Venice Music's first communication to Plaintiff referencing the flagging). Defendants' language regarding "circumvention" was relayed to Plaintiff through Venice Music's communications in July 2023 and the August 16, 2023 communication attributing the deactivation to Defendants' determination that Plaintiff's reference segments "do not meet Content ID eligibility requirements and [circumvent] Content ID monetization policy." Defendants reactivated the flagged content on November 14, 2023. Account-level suppression continued thereafter and continues to the present.

64.    **Where and how.** Defendants transmitted the designations through Defendants' proprietary backend enforcement system, visible to authorized distributors such as Venice Music through Defendants' distributor-facing interface. The "Invalid reference" designation appeared in Venice Music's distributor-facing view of Plaintiff's reference files as a system-level flag, with "Potential violation of YouTube monetization policy" displayed as the stated sub-category beneath it. Defendants further transmitted the designations to Venice Music through written communications, including communications from Defendants' Copyright Management team to Venice Music personnel, which Venice Music relayed in substance to Plaintiff.

65.    **Scienter.** Defendants made the assertions described above with knowledge of their falsity or with reckless disregard for their truth. Defendants had exclusive access to Defendants' internal enforcement systems, policy definitions, and compliance criteria. Defendants knew that Plaintiff owned 100% of the copyrights in the flagged recordings. Defendants knew that Plaintiff's recordings did not fall within any enumerated category of content ineligible for Content ID use. By November 14, 2023, Defendants had determined that the flagged content was eligible for monetization. Account-level suppression continued thereafter.

66.    **Intent to induce reliance.** Defendants transmitted the designations to distributors with the intent that Venice Music and other distributors would rely upon them by deactivating, refusing to reinstate, or declining to carry Plaintiff's reference files. Defendants' backend enforcement system was designed to make the designations visible to distributors and to carry enforcement consequences for distributors, including risks to the distributor's own Content ID access, platform standing, and ability to service other clients. The re-evaluation mechanism available to distributors is funneled through CMS access that independent rights holders such as Plaintiff do not possess, ensuring that distributor compliance is the operative consequence of the designations.

67.    **Reliance.** Venice Music relied on Defendants' designations by deactivating Plaintiff's reference files and terminating the monetization that had been underway. Venice Music's legal department stated in writing that the termination was because of Defendants' enforcement flags and the threat to Venice Music's Tier A platform standing. Plaintiff, as the rights holder whose content was the subject of the designations and whose revenue depended on continued distributor participation, suffered the operative injury from Venice Music's reliance.

68.    **Damages.** Plaintiff has suffered lost monetization revenue, destruction of distributor relationships, loss of goodwill, and ongoing daily loss of revenue. Aggregate damages will be

proven at trial and exceed the jurisdictional minimum of $75,000. Plaintiff also seeks punitive damages in connection with the fraud count.

### THIRD CAUSE OF ACTION
### Negligent Misrepresentation (New York Law) — Pleaded in the Alternative

69.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein. This claim is pleaded in the alternative to the Second Cause of Action.

70.    Defendants owed a duty of care to Plaintiff with respect to the accuracy of the backend enforcement designations Defendants transmitted to Venice Music regarding Plaintiff's content. Defendants (i) supplied factual designations to Venice Music regarding Plaintiff's specifically identified reference files; (ii) knew that Venice Music would rely on those designations in making enforcement decisions affecting Plaintiff; (iii) designed the backend enforcement system to communicate such designations through distributor intermediaries, producing distributor action affecting the underlying rights holder; and (iv) knew the specific identity of the rights holder whose content was being designated, the specific distributor to whom the designations were transmitted, and the purpose for which the distributor would use the designations.

71.    Defendants transmitted the "Invalid reference" designation, with "Potential violation of YouTube monetization policy" as its stated sub-category, without reasonable care as to the accuracy of those designations. Defendants' own subsequent review on November 14, 2023 determined that the underlying content was eligible for monetization.

72.    Venice Music relied on the designations by deactivating Plaintiff's reference files and terminating Plaintiff's monetization.

73.    Plaintiff suffered damages as a result of Venice Music's reliance, including lost monetization revenue, destruction of distributor relationships, and ongoing daily loss of revenue. Aggregate damages will be proven at trial and exceed the jurisdictional minimum of $75,000.

**FOURTH CAUSE OF ACTION**

**Trade Libel / Injurious Falsehood (New York Law)**

74.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

75.     Defendants published false statements concerning Plaintiff's business and property. The "Invalid reference" designation is a statement that Plaintiff's reference files do not meet Defendants' Content ID eligibility criteria. The "Potential violation of YouTube monetization policy" sub-category, displayed under the "Invalid reference" designation in Defendants' distributor-facing interface, is a statement that Plaintiff's reference files are being used to violate Defendants' monetization policies. Both statements are false. Plaintiff's recordings are original copyrighted works owned in their entirety by Plaintiff, are not within any category of content Defendants have published as ineligible, and do not violate any published Content ID rule applicable to rights holders. Defendants' own November 14, 2023 review confirmed that the flagged content was eligible for monetization.

76.     Defendants published these false statements to third parties. Defendants transmitted the designations to Venice Music through Defendants' distributor-facing interface and through written communications from Defendants' Copyright Management team. The statements were communicated to Venice Music's operational personnel and to Venice Music's legal department, as reflected in Venice Music's correspondence with Plaintiff's counsel. (Exs. A–C.)

77.     Defendants published the statements with malice, or alternatively with reckless disregard for their truth. Defendants had exclusive access to Defendants' internal enforcement criteria and knew that Plaintiff's content did not violate any published rule. Defendants knew that Plaintiff owned 100% of the copyrights in the flagged recordings. By November 14, 2023, Defendants had

determined that the specific flagged content was eligible for monetization; account-level suppression nonetheless continued, causing the false designations to remain operative.

78.    Defendants' statements caused Plaintiff special damages. Venice Music terminated Plaintiff's monetization based on Defendants' statements. Plaintiff's account revenue fell from $9,225.14 in August 2023 to near-zero levels within three months. In every month from June 2024 through December 2025—a period of 19 consecutive months—Plaintiff's account generated less than $1.00, with total revenue of less than $2.00 across calendar year 2025.

79.    Defendants' publication of the false statements is ongoing. The designations remain in Defendants' backend systems and continue to affect how Plaintiff's catalog is treated by Defendants and by authorized distributors.

## FIFTH CAUSE OF ACTION

### Promissory Estoppel (New York Law)

80.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81.    On November 14, 2023, Defendants, through Venice Music, communicated to Plaintiff a clear and definite determination that "YouTube has reactivated monetization on the mentioned releases." This communication was made after Defendants had reviewed Plaintiff's written TTMedia promotional agreement, Plaintiff's disclosures regarding non-ownership and non-control of the YouTube channels incorporating Plaintiff's music, and the factual basis for the specific claims flagged for review. Defendants' communication constituted a clear and definite promise that Plaintiff's flagged releases would be processed through the Content ID monetization system on the same terms as other reactivated content.

82.    Plaintiff reasonably and foreseeably relied on Defendants' promise by maintaining Plaintiff's reference files and catalog within Venice Music's Content ID participation rather than withdrawing the catalog, by continuing to administer and invest in the catalog during the months following the reactivation, and by delaying the initiation of remedial action based on the reasonable expectation that the reactivation would operate as represented.

83.    Plaintiff's reliance was to Plaintiff's detriment. Notwithstanding Defendants' reactivation of the specific flagged releases, Defendants maintained and continue to maintain account-level suppression mechanisms that prevent Plaintiff's catalog from generating Content ID revenue commensurate with its pre-enforcement performance. Plaintiff's monthly revenue following the reactivation has remained at near-zero levels for more than two years.

84.    Injustice can be avoided only by enforcement of Defendants' promise. Plaintiff seeks injunctive relief requiring Defendants to process Plaintiff's catalog consistent with Defendants' November 14, 2023 determination of eligibility and damages for the injury caused by Defendants' continued suppression contrary to that determination.

## SIXTH CAUSE OF ACTION

### Common Law Unfair Competition (New York)

85.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

86.    Defendants' conduct constitutes unfair competition under New York common law. Defendants communicated false backend enforcement designations to Plaintiff's distributor concerning Plaintiff's content. Upon information and belief, Defendants apply enforcement designations like those applied to Plaintiff's catalog to independent rights holders while not applying comparable designations to major-label rights holders engaged in materially identical

monetization activity. This differential application of enforcement, combined with Defendants' structural asymmetry between direct-access rights holders and distributor-intermediated rights holders, meant that Plaintiff had no meaningful recourse when Defendants' false designations were transmitted to Plaintiff's distributor. Defendants have maintained, and continue to maintain, account-level suppression mechanisms affecting Plaintiff's catalog after Defendants' own review determined that the specific flagged content was eligible for monetization. Defendants' asserted basis for the initial designations—that Plaintiff's reference files are "invalid" or that Plaintiff's content "circumvents" monetization policy—has been contradicted by Defendants' own reactivation determination, yet account-level suppression remains in place, reflecting selective, pretextual enforcement applied to Plaintiff's independent rights-holder catalog while, upon information and belief, comparable designations are not applied to major-label catalogs generating revenue from the same automated Content ID matching in user-uploaded videos.

87.     As a result, Plaintiff has been deprived of: (i) revenue generated from Content ID claims on videos incorporating Plaintiff's sound recordings; (ii) Plaintiff's claiming rights and associated claim history under the Content ID system; and (iii) the ability to participate in Defendants' automated monetization system on the same terms as other rights holders with undisputed copyright ownership.

88.     When Defendants suppressed Plaintiff's Content ID claims, advertising and subscription revenue that would have been allocated to Plaintiff's copyrighted recordings upon detection in user-uploaded videos was instead allocated to other rights holders whose references were detected in those same videos or retained by Defendants. Defendants have benefitted from the suppression of Plaintiff's catalog.

89.     Plaintiff has suffered injury and continues to do so. Plaintiff is entitled to injunctive relief, declaratory relief, and damages. The traditional remedy for unfair competition is injunctive relief to prevent continuing injury to the plaintiff's commercial interests.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

(A)     Compensatory damages in an amount to be proven at trial, but not less than $75,000, for all lost revenue, profits, and other harms arising from Defendants' tortious interference, fraud, negligent misrepresentation, trade libel, promissory estoppel, and unfair competition;

(B)     Punitive and exemplary damages in connection with Plaintiff's state-law claims, including fraud, trade libel, and unfair competition;

(C)     A permanent injunction ordering Defendants to:

(i)     ***Removal of existing designations.*** Remove all 'Invalid reference,' 'Potential violation of YouTube monetization policy,' 'pending,' 'under review,' and any other backend enforcement flags, designations, restrictions, or internal classifications currently applied to Plaintiff's Content ID reference files and account. This removal obligation applies to designations tagged to SocialRyse LLC, BHBIGFLUCE Records, or any individual identifier used to register, identify, operate, or tag Plaintiff's Venice Music Content ID account, reference files, or releases. Such identifiers include but are not limited to email addresses, International Standard Recording Codes (ISRCs), Universal Product Codes (UPCs), Content ID asset identifiers, and any other Defendant-assigned identifier. This removal obligation also applies to any designation that links or associates Plaintiff's

catalog with any other Defendant-operated music system, service, or monetization mechanism, including but not limited to YouTube Music and Art Tracks. Defendants shall not apply or reinstate any such designation to Plaintiff's reference files based on the content, conduct, or upload behavior of third-party YouTube channels that Plaintiff does not own or control. Any enforcement action based on third-party channel conduct shall be directed at the responsible channel operators through Defendants' channel-level enforcement tools, not at Plaintiff's reference files. Reinstatement of any designation on grounds not involving third-party channel conduct shall require compliance with subparagraph (iii) below.

(ii)    ***Same-terms processing.*** Process Plaintiff's reference files and Content ID claims (1) in accordance with Defendants' published Content ID eligibility criteria, technical standards, and revenue-allocation protocols, and (2) on terms no less favorable than those applied to rights holders of undisputed copyright ownership whose reference files and accounts are not subject to enforcement designations, suppression mechanisms, or account-level restrictions of the kind challenged in this action. Defendants shall not impose terms, restrictions, manual review requirements, claim-suppression mechanisms, or revenue-allocation adjustments on Plaintiff's catalog that exceed those imposed under Defendants' published policies or that are not uniformly applied across rights holders whose content meets Defendants' published eligibility criteria. The 'rights holders whose content meets Defendants' published eligibility criteria' referenced above shall not include rights holders subject to enforcement designations or suppression mechanisms substantially similar to those challenged in this action, and Defendants shall not satisfy this subparagraph by demonstrating that other rights holders are subject to similar enforcement.

(iii)    ***Notice and opportunity to respond.*** Before applying any new backend enforcement flag, reference file designation, monetization suppression, claim-pending status exceeding Defendants' ordinary processing times, or account-level restriction on Plaintiff's catalog, Defendants shall provide Plaintiff written notice identifying: (1) the specific content affected and the specific enforcement action proposed (including but not limited to backend flag, reference file designation, monetization suppression, claim throttling, revenue allocation adjustment, match-confidence or threshold adjustment, account-level restriction, or other enforcement mechanism), (2) the specific published rule Plaintiff is alleged to have violated, (3) the specific factual basis for the alleged violation distinct from grounds previously reviewed and determined not to warrant designation, and (4) a reasonable opportunity—not less than 30 days—for Plaintiff to respond. Defendants may apply the proposed designation only after receiving Plaintiff's response and determining in good faith, based on a specific published rule that was in effect as of the date Plaintiff filed the Complaint in this action and a specific factual basis, that the designation is warranted. Defendants shall not apply any new or amended rule or policy to Plaintiff's catalog that was not in effect as of the date Plaintiff filed the Complaint in this action unless Plaintiff consents or the Court approves the application of such rule after notice and opportunity to be heard. Defendants shall provide Plaintiff with a written reasoned determination identifying the factual and legal basis for any such decision. Such determination shall not rely on conduct of third-party YouTube channels Plaintiff does not own or control as the factual basis for designating Plaintiff's reference files, and shall be subject to the appeal mechanism set forth in subparagraph (vi).

(iv)    ***No third-party-conduct liability.*** Defendants shall not apply any backend enforcement designation, monetization suppression, or account-level restriction to Plaintiff's catalog based on the content, conduct, upload behavior, visual material, captions, descriptions, metadata, or any other aspect of YouTube channels or videos that Plaintiff does not own or control. Defendants shall address any alleged violations of Defendants' channel-level policies through channel-level enforcement mechanisms directed at the channel operators responsible for the uploaded content.

(v)    ***No circumvention through new designations or policies.*** Defendants shall not implement new backend designations, review categories, enforcement mechanisms, or published policy provisions that (a) apply to Plaintiff's catalog but not comparably to other rights holders of undisputed copyright ownership whose reference files and accounts are not subject to enforcement designations or suppression mechanisms of the kind challenged in this action; (b) impose consequences based on third-party channel conduct Plaintiff does not own or control; or (c) are adopted in response to this injunction with the purpose or effect of subjecting Plaintiff's catalog to the same or materially similar suppression from which this injunction grants relief.

(vi)    ***Direct appeal mechanism.*** Establish and maintain a direct written appeal mechanism accessible to Plaintiff when any enforcement designation affects Plaintiff's catalog. The appeal mechanism shall not require Plaintiff to hold or obtain direct CMS access. Defendants shall issue a written reasoned decision on any appeal within fourteen (14) days of Plaintiff's submission and shall make available to Plaintiff, or to the Court on in camera review, the factual and policy basis for the decision. Monetization suppression, claim withholding, or other adverse enforcement consequences shall be suspended with

respect to the content subject to the appeal during the pendency of Defendants' review, and shall remain suspended during the pendency of any motion or proceeding by Defendants seeking a Court order maintaining enforcement, until the Court has issued an order on such motion. Defendants may seek a Court order maintaining enforcement during review only upon a showing by clear and convincing evidence that (1) continued enforcement is necessary to prevent imminent, material, and irreparable harm to Defendants' platform or to specifically named third parties; (2) such harm arises from the inherent characteristics of Plaintiff's reference files themselves and not from the content, conduct, or upload behavior of third-party YouTube channels or videos that Plaintiff does not own or control; (3) the harm cannot be addressed through channel-level enforcement directed at the responsible third-party channel operators; and (4) no less restrictive alternative would adequately address such harm. Any such motion shall be made in writing and on notice to Plaintiff, and Plaintiff shall have an opportunity to be heard and to submit written argument and rebuttal evidence in opposition before any such Court order is issued. Any such Court order shall be without prejudice to Plaintiff's right to seek modification or dissolution of the order upon a material change in circumstances or new evidence.

(vii)    ***Preservation of ordinary platform operations.*** Nothing in this injunction shall require Defendants to deviate from their ordinary Content ID operations in ways that would materially disrupt automated processing. The relief ordered here is directed at removing discriminatory treatment of Plaintiff's catalog and preventing future discriminatory treatment, not at altering Defendants' automated Content ID system generally. This subparagraph shall not be construed to limit or excuse Defendants' obligations under any other subparagraph of this injunction, and Defendants' compliance with subparagraphs (i)

through (vi) and (viii) through (xi) shall not be deemed a material disruption of automated processing.

(viii)    ***No suppression absent completed determination.*** Defendants shall not maintain on Plaintiff's reference files any designation, status, flag, classification, hold, or other backend mechanism—regardless of label or characterization—that suppresses, restricts, withholds, delays, or reduces Content ID monetization, unless Defendants have (a) completed a final determination that the designated content violates a specific, published Content ID rule that identifies objective conduct or content characteristics constituting the violation. For purposes of this subparagraph, references in Defendants' published rules to 'abuse,' 'error,' 'invalid,' 'discretionary review,' 'suspicious,' or similar discretionary or categorical language shall not satisfy this requirement unless Defendants also identify the specific objective conduct or content characteristic alleged to constitute the violation; (b) identified the specific rule violated, the specific factual basis for the violation, and the specific enforcement action or mechanism being maintained (including but not limited to flag, designation, suppression, claim throttling, revenue allocation adjustment, match-confidence adjustment, account-level restriction, or other enforcement mechanism), all in writing to Plaintiff; and (c) provided the procedural protections set forth in subparagraphs (iii) and (vi) above. The requirements of this subparagraph apply regardless of the terminology, label, classification, or characterization Defendants use. Any mechanism that remains on Plaintiff's reference files for more than fourteen (14) days without all of the requirements of (a), (b), and (c) having been satisfied within that fourteen-day period shall be removed by Defendants. Defendants shall not evade the requirements of this subparagraph by renaming, relabeling, reclassifying, or otherwise recharacterizing

mechanisms that produce the suppression effect described herein. Nor shall Defendants evade the requirements of this injunction by shifting enforcement, suppression, revenue reduction, or tagging of Plaintiff's catalog to other Defendant-operated music systems, services, or monetization mechanisms in a manner that produces the suppression effect described herein.

(ix)    *Good-faith compliance.* Defendants shall comply with this injunction in good faith, interpreting its requirements in light of their purpose to prevent discriminatory treatment and suppression of Plaintiff's Content ID monetization. Technical compliance with the literal terms of specific subparagraphs shall not excuse conduct that frustrates the injunction's purpose. The Court retains jurisdiction to enforce this injunction and to hold Defendants in contempt for violations, including serial, pretextual, or evasive conduct. Willful violations of this injunction shall be subject to enhanced contempt sanctions, including daily fines, disgorgement of profits derived from the violation, and Plaintiff's attorneys' fees and costs incurred in enforcement.

(x)    *Matching and claim generation parity.* Defendants shall operate the Content ID matching and claim-generation functions with respect to Plaintiff's reference files in accordance with Defendants' published technical standards and protocols, and on terms no less favorable than those applied to rights holders of undisputed copyright ownership whose reference files are not subject to enforcement designations or suppression mechanisms of the kind challenged in this action. Defendants shall not configure, adjust, suppress, throttle, or otherwise interfere with the matching, detection, or claim-generation processes applicable to Plaintiff's reference files in ways that exceed Defendants' published technical standards or that are not uniformly applied across reference files of

content meeting Defendants' published eligibility criteria. This prohibition applies to any backend configuration, filter, threshold, audio-fingerprint adjustment, match-confidence setting, or other technical mechanism that affects whether Plaintiff's content is detected and claimed in user-uploaded videos. The 'reference files of content meeting Defendants' published eligibility criteria' referenced above shall not include reference files of rights holders subject to enforcement designations or suppression mechanisms substantially similar to those challenged in this action.

(xi)    ***Compliance reporting.*** Defendants shall provide Plaintiff with quarterly written reports, delivered within thirty (30) days after the end of each calendar quarter, for a period of not less than three (3) years following entry of this injunction, identifying on a month-by-month basis: (a) any enforcement designation, status, or mechanism applied to Plaintiff's reference files during each month of the reporting period; (b) the specific published rule and factual basis for any such designation; (c) revenue allocation data for Plaintiff's catalog for each month of the reporting period; and (d) any material changes to Defendants' published Content ID policies during the reporting period that may affect Plaintiff's catalog; and (e) any written communications between Defendants and authorized distributors regarding the enforcement treatment of Plaintiff's catalog during the reporting period. Plaintiff may seek enforcement of this injunction through motion practice in this Court based on information disclosed in such reports.

(xii) Retention of jurisdiction. This Court shall retain continuing jurisdiction over the parties and this action for purposes of enforcing, interpreting, and modifying this permanent injunction. Plaintiff may bring any motion to enforce compliance with,

interpret, or seek modification of this Order on an expedited basis upon a showing of good cause.

(D)     A declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (1) Defendants' "Invalid reference" designation applied to Plaintiff's reference files, and the "Potential violation of YouTube monetization policy" sub-category displayed thereunder, are false; (2) Plaintiff's Content ID reference files and catalog are eligible for Content ID monetization in accordance with Defendants' published Content ID eligibility criteria and revenue-allocation protocols, and on terms no less favorable than those applied to rights holders of undisputed copyright ownership whose reference files and accounts are not subject to enforcement designations or suppression mechanisms of the kind challenged in this action; (3) Defendants owe a duty of ordinary care and honesty in the factual designations they transmit to authorized distributors concerning rights holder content; (4) Defendants' application of enforcement designations to rights holder reference files based on the conduct of third-party YouTube channels that rights holders do not own or control constitutes a wrongful basis for such designations; and (5) Defendants' continued maintenance of account-level suppression mechanisms after a determination of eligibility is inconsistent with good-faith operation of the Content ID system;

(E)     Pre- and post-judgment interest at the maximum lawful rate;

(F)     Reasonable attorneys' fees and the costs and expenses of this action to the extent permitted by law; and

(G)     Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 30, 2026
      New York, New York

                        Respectfully submitted,

                        /s/ Courtney K. Davy_____
                        **COURTNEY K. DAVY, ESQ.**
                        Attorney for Plaintiff
                        299 Broadway, Suite 800
                        New York, NY 10007
                        (516) 850-1800
                        Courtneydavy.esq@gmail.com
                        cdavy@cdavylaw.com